***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing as
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the plaintiff's alleged accident of December 4, 2001, an employee/employer relationship existed between the plaintiff and the defendant-employer.
3. The defendant-employer was insured for workers' compensation coverage at all relevant times.
4. The plaintiff's average weekly wage and compensation rate, may be confirmed by a properly prepared Form 22, pursuant to N.C. Gen. Stat. §97-1 et seq.
5. The parties stipulated that the following documents are authentic and genuine and are admissible into evidence without being subject to further identification. The defendants do not stipulate to any factual descriptions or opinions rendered by health care providers.
(a) Records from Petaluma Valley Hospital;
(b) Records from Asheville Family Health;
(c) Records from Asheville MRI/Radiology;
(d) Records from Blue Ridge Bone Joint Clinic;
(e) Records from Mission St. Joseph's Health System;
(f) Records from Proactive Therapy, Inc.; and
(g) Records from Randy Adams, M. Ed.
6. The issues for determination before the Commission are:
a. Whether the plaintiff suffered an injury by accident to his back on December 4, 2001 arising out of and in the course of his employment;
b. If so, what are the compensable consequences of the plaintiff's December 4, 2001, injury by accident;
c. Whether and when the plaintiff gave the defendant-employer notice of the alleged injury by accident;
d. Whether and to what extent the plaintiff has been disabled as the result of the alleged injury by accident; and
e. Whether the plaintiff needs and is entitled to medical compensation as the result of the alleged injury by accident.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was 44 years of age, and had obtained his GED. He has worked most of his career as a long-distance truck driver.
2. Plaintiff was employed by defendant-employer as a long-distance truck driver on two separate occasions. He worked for seven months in 1991, and most recently for the seven year period preceding December 4, 2001. The plaintiff drove from North Carolina to California. His work sometimes required that the plaintiff load and unload cargo, depending on the particular job. As testified by the general manager, Don Linn, the plaintiff was a good worker.
3. In early December 2001, the plaintiff started out on a route that took him from North Carolina to Texas and then to California. While in Texas, the plaintiff spent an extended amount of time in his truck cab. As he was leaving Texas, on the way to California, the plaintiff began experiencing muscular pain in his lower back. Although annoying, his pain at that time did not interfere with his ability to drive his truck or do his job.
4. On December 4, 2001, the plaintiff was scheduled to pick up a load of wine at Western Wine Warehouse in California. For reasons not entirely clear from the record, the plaintiff encountered some difficulties with the loading dock manager and was delayed picking up the load. The wine was eventually brought out for the plaintiff to load himself. He then loaded between 50 and 60 boxes of wine bottles, weighing about forty-five (45) pounds each. The plaintiff was upset that he had been delayed and was in a hurry, and thus was working quickly. As he was loading the boxes and trying to wrap the pallets in "shrink wrap," the plaintiff experienced a "pinching pain" in his back and his legs felt weak like they would give out.
5. The plaintiff made several more load pickups that day, but did not have to do the loading himself. He slept that night in his cab. The next day, his pain continued, but he didn't fully realize the extent of his problem until he started to drive. When he began driving his truck, he had problems trying to depress the clutch with his left foot.
6. Plaintiff called Don Linn, General Manager of defendant-employer, and expressed concerns over his back pain. At that time, the plaintiff did not specifically mention to Mr. Linn that his pain had worsened after moving the wine boxes. Mr. Linn made an appointment for the plaintiff at the Petaluma Valley Hospital, where he was seen on December 5, 2001. The Petaluma Valley Hospital notes indicated that the plaintiff had experienced pain for five days and that the back pain became "much worse" while moving boxes on December 4, 2001.
7. At Petaluma Valley Hospital, the plaintiff was given pain medicines, including Flexeril, a muscle relaxant, and Hydrocodone, and was told he could not drive his truck while taking these medicines. He was also instructed to see his own doctor when he arrived home. The plaintiff did not drive for the next 24 hours. Mr. Linn offered to have someone else drive the truck back to North Carolina, but the plaintiff declined the offer and decided to drive himself.
8. After a day of rest, the plaintiff drove defendant-employer's truck back to North Carolina. At Mr. Linn's request, on December 13, 2001, the plaintiff went to see Dr. Mark Lenderman at Asheville Family Health Center. Dr. Lenderman's notes do not mention the incident with the plaintiff moving the wine boxes, but do mention that the plaintiff had problems with his back while in California. Dr. Lenderman saw the plaintiff for several visits before referring him to Dr. Daniel Hankley at Blue Ridge Bone and Joint.
9. Dr. Lenderman was of the opinion that the incident of moving the boxes of wine was related to the plaintiff's back symptoms. It was also his assessment that the plaintiff was unable to work during the time he was treating him from December 13, 2001, through April 15, 2002, the last time he saw the plaintiff. Dr. Lenderman did not have an opinion as to the permanency of the plaintiff's back condition.
10. Dr. Hankley first examined the plaintiff on January 29, 2002. The plaintiff told Dr. Hankley that he had injured his back on December 4, 2001, while moving boxes. Dr. Hankley ordered an MRI of the plaintiff's lumbar spine, which revealed a herniated disk at L5-S1. Dr. Hankley attempted to treat the plaintiff by conservative measures, such as steroid injections. When these measures did not bring the plaintiff relief, on February 27, 2002, Dr. Hankley referred the plaintiff to his colleague Dr. Michael Goebel, for surgical consultation.
11. On March 4, 2004, Dr. Goebel performed a laminotomy and diskectomy at the L5-S1 level. The plaintiff saw Dr. Goebel for two post-operative appointments. On April 16, 2002, after conducting a neurological physical examination of the plaintiff, Dr. Goebel noted that he had done quite well and released the plaintiff to return to work full duty with no restrictions.
12. Dr. Goebel's testimony shows that the plaintiff had pre-existing moderate spondylosis or arthritic changes at L5-S1, when Dr. Goebel first examined him. However, Dr, Goebel also testified to the effect that the lifting of the wine boxes could have triggered the extrusion or herniation of the plaintiff's disk. Dr. Goebel testified that this extrusion would have caused the plaintiff considerable leg pain, which is consistent with the plaintiff's visit to the California hospital the next day.
13. After his release by Dr. Goebel, the plaintiff contacted the defendant-employer about returning to work, but this was not worked out. Apparently, there was some concern over the pending workers' compensation claim. At least by that time, the employer and carrier had notice of the plaintiff's claim that his back injury was work-related.
14. The plaintiff did not seek any additional medical treatment for his back until he visited the emergency room at Mission Saint Joseph's Hospital on October 29, 2002. The October 2002 visit was triggered when the plaintiff jarred his back while driving over railroad tracks approximately four days prior to his emergency room visit.
15. Subsequent to the hearing, on October 9, 2003, Dr. Goebel examined the plaintiff. At that time, the plaintiff had began working for Goodwill, reportedly driving a truck and picking up donations. He complained to Dr. Goebel about back pain and numbness in his legs. After examining the plaintiff and reviewing x-rays, Dr. Goebel recommended a L5-S-1 fusion surgery due to his severe spondylosis and degeneration of the disc with a right paracentral disc protrusion. This surgery had not yet been performed at the Deputy Commissioner's close of the evidence.
16. The evidence establishes that the plaintiff experienced an aggravation of his back injury on October 25, 2002, when he was "jarred" as he drove across a railroad track. However, this was not an independent intervening cause, which can be separated out from his prior back injury. It would be unreasonable to expect that the plaintiff would not experience "jarring" and aggravation of his back condition in the course of driving, especially if he had indeed returned to work as a truck driver. The aggravation of his back appears to be a natural progression of the prior injury, and not a specific intervening cause.
17. The plaintiff has worked with at least two counselors through North Carolina Vocational Rehabilitation. The testimony of these two counselors shows that the plaintiff has made reasonable efforts to find suitable employment. He has been cooperative with their suggestions. The plaintiff has made numerous job applications on his own and coordinating with NC Division of Vocational Rehabilitative Service, JobLink, and the Employment Security Commission.
18. In February 2003, the plaintiff began working with Goodwill Industries, making about $7.50 per hour. The plaintiff testified that he has unsuccessfully tried short-range trucking in his work at Goodwill, but that it aggravated his back condition. He continued to work for Goodwill at the time of the hearing.
19. The plaintiff's testimony shows that he received unemployment benefits at the rate of around $312.00 per week from April 2002 to October 2002. However, the Full Commission finds that defendants should not be allowed a credit for these benefits against any compensation for wage loss awarded to the plaintiff because of the defendants' consistent denial of this compensable claim.
20. Randy Adams, M.Ed., CVE, a vocational expert, was retained by the plaintiff and testified on his behalf. Mr. Adams testified during his deposition that despite the fact that the plaintiff had a solid work history, taking into consideration the results obtained by various tests administered by him, and the plaintiff's medical conditions, the plaintiff would most likely be unable to return to work as a long distance trucker. Mr. Adams was of the opinion that vocational efforts for suitable employment should be suspended until fusion surgery and recovery was completed.
21. In weighing all the evidence, the Full Commission finds the plaintiff's testimony to be credible and supportive of his claim that he did injure or aggravate his back condition while loading wine boxes on December 4, 2001. His testimony is supported by the medical evidence.
22. As a consequence of his back injury, the plaintiff has been unable to return to his prior employment as a truck driver. He has been unable to earn wages in any employment for an extended period of time, until he found the limited duty work at Goodwill Industries. This work, although genuine work which provides wages, is not typical of employment available in the general economy, and is not an accurate reflection of the plaintiff's true wage earning capacity.
23. The plaintiff is entitled to receive benefits for his temporary total disability during the periods he was unable to work and for temporary partial disability during the period he has been earning some wages at Goodwill Industries.
24. The plaintiff has not reached maximum medical improvement and is in need of further medical treatment and the surgery recommended by Dr. Goebel, to be authorized and provided by the defendants. Additional rehabilitation efforts are premature until the surgery is completed and the plaintiff is assessed and released for a return to work or vocational rehabilitation by his treating physician.
25. The defendants provided a Form 22, although the same was not properly completed. Records attached to that form, and testimony from Mr. Linn, indicates that the plaintiff worked approximately thirty-seven weeks during the year preceding his accident, during which he earned $30,443.46. The Full commission finds these earnings yield an average weekly wage of $822.80, with a resulting weekly compensation rate of $548.56.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On December 4, 2001, the plaintiff sustained an injury by accident to his back arising out of and in the course of his employment with the defendant-employer while he was loading wine boxes for transport from California to the east coast. N.C. Gen. Stat. § 97-2(6).
2. As a consequence of the accident, the plaintiff sustained injury and/or aggravation to his pre-existing back condition, resulting in a herniated dick, such that medical treatment, including surgery, was reasonably necessary. The defendants are responsible for payment for all such reasonably necessary treatment. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
3. As a consequence of the injury by accident, the plaintiff was unable to earn any wages in the same or any other employment from December 13, 2001, and continuing at least until February 2003, when he found part-time employment with Goodwill Industries. The defendants are responsible for paying the plaintiff compensation for total disability from December 13, 2001, until February 2003 pursuant to N.C. Gen. Stat. § 97-29.
4. As a consequence of the injury by accident, the plaintiff has been unable to find suitable employment at the same wages he was earning prior to his injury. The defendants are responsible for paying the plaintiff compensation for partial disability from February 2003 and continuing to the present or until further order of the Commission. N.C. Gen. Stat. §97-30.
5. It is anticipated that the plaintiff will experience a further period of temporary total disability if and when he undergoes the additional back surgery, and in that event, the defendants shall again be responsible for payment of benefits pursuant to N.C. Gen. Stat. § 97-29.
6. The plaintiff's average weekly wage was $822.80, with a resulting compensation rate of $548.56. N.C. Gen. Stat. § 97-2(5).
7. The plaintiff has not reached maximum medical improvement and is entitled to additional treatment, including the surgery recommended by Dr. Goebel. The defendants are responsible for providing the same. N.C. Gen. Stat. §§ 97-2(19), 97-25.
8. The defendants' denial and defense of this claim was unreasonable. Within the discretion of the Full Commission, the defendants are not entitled to a credit, pursuant to N.C. Gen. Stat. § 97-42, for unemployment benefits paid to the plaintiff.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay all medical expenses incurred or to be incurred by the plaintiff for reasonably necessary medical treatment for his back injury.
2. The defendants shall pay to the plaintiff compensation at the rate of $548.56 per week as temporary total disability benefits from December 13, 2001, until February 2003 when the plaintiff began part-time work with Goodwill Industries. All accrued benefits shall be paid in a lump sum, subject to the attorney's fee approved herein.
3. The defendants shall pay to the plaintiff compensation for temporary partial disability benefits, taking into consideration his wages at Goodwill Industries, beginning February 2003 and continuing until further order of the Commission. All accrued benefits shall be paid in a lump sum, subject to the attorney's fee approved herein.
4. The defendants shall be responsible for paying benefits for any additional periods of temporary total disability in the future as may be necessitated by the recommended back surgery.
5. An attorney's fee of twenty-five percent of the compensation due the plaintiff under this Award is approved for the plaintiff's counsel. Twenty-five percent of the lump sum due the plaintiff shall be paid directly to his counsel. Thereafter, every fourth compensation check shall be made payable and forwarded to the plaintiff's counsel.
6. The defendants shall pay the costs.
This 3rd day of October 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN